UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


LONNIE OLMETTI,

                Plaintiff,

v.

KENT COUNTY, *et al.*,

                Defendants.

_____/

Case No. 1:20-cv-395

Hon. Hala Y. Jarbou

## REPORT AND RECOMMENDATION

Plaintiff Lonnie Olmetti was incarcerated at the Kent County Correctional Facility ("KCCF").  Olmetti, through counsel, has filed a lawsuit against a number of defendants for alleged violations of his civil rights pursuant to 42 U.S.C. § 1983 and state tort law.  This matter is now before the Court on defendant Joanne Sherwood, N.P.'s motion for summary judgment (ECF No. 74).

### I.      Background

Olmetti's complaint names seven defendants: Kent County; Kent County Sheriff's Department employees Deputy Tyler King and Deputy Justin Linsea; N.P. Joanne Sherwood; and defendants Justin Mezsetz, Shane Cole, and Eric Santiago (identified as "sheriff's deputies or corrections officers").  Compl. (ECF No. 1, PageID.1-2).[1]  The present motion involves Olmetti's claims against N.P Sherwood.

---

[1] Olmetti also lists "John/Jane Does" whom he refers to as unknown "sheriff deputies or corrections officers" working at the KCCF.  *Id*. at PageID.2.  He has not identified these "Doe" defendants.

Olmetti's claims arose when he was held as a pretrial detainee at the KCCF. *Id*. at PageID.3. During this time, Olmetti stated that he was 60 years old, was disabled collecting SSI (supplemental security income), had "severe back problems that went back for decades", had "severe arthritis", and "was in need of knee and hip replacements." *Id*. On November 10, 2017, Olmetti was "booked" at the KCCF for a criminal charge of assault with intent to commit murder. *Id*. He "bonded out" on or about March 23, 2018, was arrested on or about March 25, 2018, and was booked again at the KCCF. *Id*. Booking records from March 26, 2018, noted that Olmetti had a "bad back," including spinal stenosis, bone spurs, and a bulging and herniated disc. *Id*. at PageID.4. According to the complaint, "the March 26, 2018 booking records clearly indicate that during [p]laintiff's incarceration from November 2017 to March 23, 2018, [p]laintiff had a lower bunk assignment due to his significant and obvious medical conditions involving his back and spine." *Id*.

On or about March 26, 2018, defendant Santiago classified Olmetti to be housed in general population. *Id*. Santiago made no mention of Olmetti's severe medical conditions and did not ensure that plaintiff was given a low bunk detail. *Id*. Olmetti alleged that he "repeatedly made it known to [d]efendants and the corrections staff that he had severe back problems; that he had previously been assigned a lower bunk detail while at the KCCF; and again needed a lower bunk detail because of his serious back problems." *Id*. However, Olmetti was only given a "lower bunk/lower level assignment" from March 26, 2018 through March 28, 2018. *Id*.

Olmetti alleged that defendant N.P. Sherwood was employed by defendant Kent County to work as a nurse practitioner at the KCCF. *Id*. at PageID.2. Olmetti alleged that:

> On March 28, 2018, Defendant Nurse Practitioner Sherwood wrote an order to discontinue the lower bunk detail for Plaintiff.

*Id*. at ¶ 26, PageID.5.

Defendant Santiago re-classified Olmetti on March 29, 2018, for purposes of housing. *Id*. That same day, defendant Cole moved Olmetti to a new cell. *Id*. Olmetti was not given a low bunk detail. *Id*. Defendant Mezsets was aware of Olmetti's serious medical needs and prior low bunk details, but did not ensure that he received a low bunk detail. *Id*. On April 3, 2018, Olmetti fell out of the top bunk, suffered serious injuries, and was rushed to the hospital. *Id*. Despite Olmetti's complaints, defendants King and Linsea handcuffed him in an "extremely tight manner" and escorted him to the hospital. *Id*. Olmetti was treated for a scalp laceration, fractured ribs, and received "a sling for comfort in the setting of his rib fractures." *Id*. When Olmetti returned from the hospital on April 3, 2018, unnamed defendants refused to permit him to wear his sling, refused to let him use an incentive spirometer, and refused to give him 2 mats. *Id*.

Olmetti does not allege a specific claim or count against N.P. Sherwood. Rather, the complaint alleged: that "all defendants" were deliberately indifferent to his serious medical needs in violation of the 14th Amendment (Count I); that "all defendants" deprived him of life's necessities in violation of the 14th Amendment (Count II); and that "all defendants" were grossly negligent (Count IV). *Id*. at PageID.6-12.[2] The Court previously dismissed Count II directed at defendant N.P. Sherwood. *See* Order (ECF No. 23, PageID.357).

## II.    Defendant N.P. Sherwood's motion for summary judgment

### A.    Legal standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 further provides that a party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

---

[2] The Court notes that Olmetti's other two counts are not directed at N.P. Sherwood. Count III is directed at defendants King and Linsea for use of unreasonable force and Count V is directed at defendant Kent County.

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in a motion for summary judgment:

The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, the Court is not bound to blindly adopt a non-moving party's version of the facts. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### B.    Discussion

### 1.    14th Amendment claim (Count I)

Olmetti seeks relief pursuant to 42 U.S.C. § 1983, which "provides a civil cause of action for individuals who are deprived of any rights, privileges, or immunities secured by the Constitution or federal laws by those acting under color of state law." *Smith v. City of Salem*,

4

Ohio, 378 F.3d 566, 576 (6th Cir. 2004).  To state a § 1983 claim, a plaintiff must allege two

elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and

(2) that the defendant deprived him of this federal right under color of law.  *Jones v. Duncan*, 840

F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

During the relevant time period, Olmetti was in the custody of KCCF as a pre-trial

detainee.  "Although the Eighth Amendment's protections apply specifically to post-conviction

inmates, the Due Process Clause of the Fourteenth Amendment operates to guarantee those same

protections to pretrial detainees as well."  *Miller v. Calhoun County*, 408 F.3d 803, 812 (6th Cir.

2005)  (internal citation omitted).  It is well established that an inmate has a cause of action under

§ 1983 against prison officials for "deliberate indifference" to his serious medical needs, since the

same constitutes cruel and unusual punishment proscribed by the Eighth Amendment.  *Estelle v.

Gamble*, 429 U.S. 97 (l976).  "Whether a convicted prisoner or a pretrial detainee, deliberate

indifference to one's need for medical attention suffices for a claim under 42 U.S.C. § 1983."

*Blackmore v. Kalamazoo County*, 390 F.3d 890, 895 (6th Cir. 2004).

A viable Eighth Amendment claim consists of an objective and a subjective

component.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  A court considering such a claim must

ask both if the alleged wrongdoing was objectively harmful enough to establish a constitutional

violation and if the officials acted with a sufficiently culpable state of mind.  *Hudson v. McMillian*,

503 U.S. 1, 8 (1992).  The objective component requires the infliction of serious pain or failure to

treat a serious medical condition.  *Id.* at 8-9.  "Because society does not expect that prisoners will

have unqualified access to health care, deliberate indifference to medical needs amounts to an

Eighth Amendment violation only if those needs are 'serious.'" *Id.*  at 9.

The subjective component requires that the defendant act with deliberate indifference to an inmate's health or safety. *See Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991). To establish the subjective component, the plaintiff must show that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.  Mere negligence in diagnosing or treating a medical condition does not constitute an Eighth Amendment violation. *Id.* at 835. "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

### 2.    Olmetti's claims

The gist of  Count I is that N.P. Sherwood was deliberately indifferent to Olmetti's serious medical needs in violation of the 14th Amendment because: (1) N.P. Sherwood improperly removed the low bunk alert or assignment on March 28, 2018; (2) N.P. Sherwood should have continued the low bunk alert or assignment given to Olmetti during his November incarceration because he had been away from KCCF for less than three days; and, (3) N.P. Sherwood failed to provide Olmetti with the appropriate medical attention to treat his injuries when he returned from the hospital.

### 3.    Background

Olmetti was incarcerated at KCCF from November 10, 2017, through March 23, 2018 (the "November incarceration").  *See* Olmetti's Response (ECF No. 78-1, PageID.1055). Olmetti was given a low bunk because of his physical disabilities that made climbing the ladder to an upper bunk difficult.  *Id*.  Olmetti was released on March 23, 2018, and does not allege any claims related to the November incarceration.  After his release, Olmetti testified that he had some

6

drinks, ordered two pizzas, ate them, got sick and passed out in a hotel room.  Olmetti Deposition

(ECF No. 74-1, PageID.912-914).  Olmetti testified that members of the Kentwood Police and

Kentwood Fire Department broke down the door, roughed him up, had a pushing match, and then

arrested him.  *Id*. at PageID.912.  At the same time, Olmetti testified that he has no memory of the

incident.  *Id*. at PageID.912-914.

   Olmetti was taken to the KCCF on March 25, 2018, where he was booked for

charges of hindering and opposing a police officer and disorderly person (drunk).  KCCF Record

(ECF No. 74-2, PageID.926).  Olmetti was brought in at approximately 1600 hours.  *Id*.  At 1610

it was brought to staff's attention that Olmetti had fallen down and was unresponsive.  *Id*.  Nurse

Chad advised the police officers that they could not book Olmetti and a non-emergency ambulance

was requested.  *Id*.

> At approximately 1620 hours Olmetti woke up and was communicating verbally to
> Nurse Chad.  Nurse Chad was crouched down over Olmetti evaluating him, when
> Olmetti reached up with his left hand and punched Nurse Chad in the face.

*Id*.  Olmetti was secured, told to relax, and then fell asleep on the floor.  *Id*.  He was placed on a

stretcher with soft restraints applied by the first responder and taken to Butterworh Hospital.  *Id*.

   At the hospital, Olmetti's medical history was recorded in pertinent part as follows:

> Patient was recently jailed for 6 months for an OUWI, and released
> 3 days ago.  Patient was found at a nearby motel by a bystander,
> passed out in a pool of his own vomit.  Bystander called EMS, when
> the fire department arrived, the patient became combative, swinging
> punches at the fire department. Patient was therefore put in jail,
> where he was continuously combative with the jail nurse and police.
> Patient fell and hit his head while at jail. Patient was brought in by
> EMS with police following this. Patient was combative with hospital
> staff while here. He is placed in leather restraints, which were
> evaluated for tightness, with ability to fit 1 finger underneath all of
> them, after his right was loosened 1 strap.

Hospital Records (March 25, 2018) (ECF No. 74-4, PageID.937).

The physical examination at the hospital noted that Olmetti was aggressive and yelling, and that he had a normal range of motion in both "neck" and "musculoskeletal".  *Id*. at PageID.938.  The psychiatric examination noted that,

> His affect is angry and inappropriate.  His speech is slurred.  He is agitated and aggressive.

*Id*.  The diagnosis was "Agitation requiring sedation protocol."  *Id*. at PageID.939. Prior to his discharge, medical staff was "awaiting clinical sobriety" and that "[h]e became sober enough to ambulate without difficulty."  *Id*.  Olmetti was discharged into the care of the police on March 26, 2018.  *Id*.  Olmetti's claims against NP Sherwood relate to his care when he was returned to the KCCF.

### 3.    Constitutional Claims

### (a)  N.P. Sherwood improperly removed the low bunk assignment on March 28, 2018

The jail medical records reflect that the low bunk detail commenced on March 26, 2018, at 02:56 (entered by Robin A. Balzeski) and ended on March 28, 2018, at 05:21 (entered by Melissa A. Furnace) (ECF 74-2, PageID.922).  N.P. Sherwood testified that an RN can place a patient on a low bunk detail, stating that

> if the patient has a seizure -- a seizure disorder or he's withdrawing from alcohol or other substances, the registered nurse in the intake department can place them on a low bunk.

N.P. Sherwood Dep. (ECF No. 74-6, PageID.984).  For purposes of alcohol withdrawal, the low bunk detail is usually for a period of time rather than indefinite.  *Id*.  N.P. Sherwood explained,

> When the patient is finished with their withdrawal checks, with the withdrawal protocol, and the nurse -- the nurse will call a physician or myself and say this patient is finished with their protocol and they don't appear to need it any longer, they're not scoring, may we discontinue that.

*Id*.

Olmetti's claim against N.P. Sherwood arose from the March 28th order discharging him from the withdrawal checks and lower bunk alert.  However, there is no evidence that N.P. Sherwood entered the March 28th order.  Rather, the medical records reflect that Dr. Carel [sic] (or Carol) gave the order (ECF No. 74-5, PageID.956).  Consistent with these records, N.P. Sherwood testified that she did not enter either the March 26, 2018 low bunk alert or the March 28, 2018 order discontinuing the alert:

Q. Okay. So it says low-bunk only alert was entered by medical, is that correct?

A. Entered by that I recognize the name and she is a registered nurse.

Q. Okay. And again, do you recall one way or another if you had any discussion with Robyn B, I'll just say it that way, regarding putting Mr. Olmetti on a low-bunk detail on March 26th?

A. No.

Q. Okay. I think in your testimony earlier, a registered nurse, if it's for withdrawal purposes or a seizure, could do that on their own without consulting you, is that correct?

A.  Yes.

Q.  But to take them off, requires you or one of the doctors?

A. Yes.

Q. Okay. Based on this document, do you know why a low-bunk was given?

A. No.

Q.  Okay.  And then it says Furness on March 28th, 2018 at 5:21. Do you know who Melissa Furness is?

A. Melissa still works with us and she's a registered nurse.

Q. Okay. Now, it says ended by her. What does that mean?

A. I don't know.

Q. Okay. Does that mean -- does that mean she ended the low-bunk alert or you don't know?

A. It looks like that the low-bunk that is the gist of this and that it was -- I think I can safely suggest that she entered it in the computer, but that's really all.

Q. Okay. She entered it, but it would have to be authorized by you or one of the two doctors?

A. Correct.

Q. Okay. Do you have an independent recollection if you authorized the ending of the low-bunk alert on March 28th, 2018 at 5:21?

A. No.

Q. Okay.

A. I did not give that order and I did not write the order or enter it in the computer.

Q. But do you have an independent recollection if you verbally gave it?

A. I did not.

Q. Okay. Do you know -- do you know who did?

A. If I -- if it referred to the record, it looks like that was Dr. Carol that gave that order.

Sherwood Dep. (ECF No. 74-6, PageID.990-991).

The only evidence which suggests that N.P. Sherwood entered the March 28th order is an undated summary of Olmetti's medical records prepared by a non-party employee of Corizon Health, Penny Johnson, RN, H.S.A. (Health Services Administrator) which appears in a letter to the Kent County Department of Civil Rights (ECF No. 84-8, 1442-1443).[3]  In the medical record letter/summary, RN Johnson stated in pertinent part:

03/28/18 – 2:30 pm:  NP Sherwood wrote an order to discontinue the withdrawal checks which also included discontinue [sic] of the WD [withdrawal] and LB [low bunk] alerts.

---

[3] This letter/summary was filed as an exhibit to a different motion.

Johnson Letter/Summary (undated) at PageID.1442.

In an affidavit dated May 5, 2022, RN Johnson stated that her summary of the medical records contained an error by listing N.P. Sherwood as the person who entered the March 28, 2018 order to discontinue the WD and LB alerts, stating in pertinent part,

> 4. Upon reviewing my summary of medical I records and the patient's actual medical records, I am able to see that I inadvertently listed N.P. Sherwood as the provider on March 28, 2018 that "wrote an order to discontinue the withdrawal checks which also included discontinue of the WO (withdrawal) and L8 (low bunk) alerts." Upon review of the records and March 28, 2018 order, I inadvertently made a mistake on this part of the summary. N.P. Sherwood did not write this order. The order clearly slates the names of other providers who wrote and issued the order, and that it was not N.P. Sherwood.
>
> 5. lf ever called upon to testify in this matter regarding this issue, I will testify to the above statements, and I will refer to the actual medical record and medical orders as to what actions were done and by whom. If ever asked to testify about my summary of medical records, I would first verify the summary with the medical records, and will defer to the patient's actual medical records for the sake or completeness and accuracy. In this case, the medical records are clear that it was not N.P. Sherwood who wrote or issued the order at issue.

Penny Johnson Aff. (ECF No. 106-2, PageID.2681-2682).

Olmetti cannot rely on RN Johnson's summary of his medical records which conflicts with the substance of the actual medical record. The basis for allowing this summary into evidence would be Fed. R. Evid. 1006, which provides:

> The proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court. The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place. And the court may order the proponent to produce them in court.

Fed. R. Evid. 1006. "[U]nder Rule 1006, the summary or chart must be accurate, authentic and properly introduced before it may be admitted in evidence." *United States v. Scales*, 594 F.2d 558, 563 (6th Cir. 1979). As one court explained,

It is well established that FRE 1006 is an exception to the best evidence rule. *See U.S. v. Weaver*, 281 F.3d 228, 232 (C.A.D.C.2002). The purpose of FRE 1006 is "to allow the use of summaries when the volume of documents being summarized is so large as to make their use impracticable or impossible; summaries may also prove more meaningful to the judge and jury." *U.S. v. Johnson*, 594 F.2d 1253, 1255 (9th Cir.1979). The burden is on the proffering party to show that the summary is admissible. *Amarel v. Connell*, 102 F.3d 1494, 1516 (9th Cir.1996). FRE 1006 should not be used as a back-door vehicle for introduction of evidence which is otherwise inadmissable. *Peat, Inc. v. Vangaurd Research, Inc.*, 378 F.3d, 1154, 1160 (11th Cir.2004)[.]

*Sims v. Lakeside School*, No. C06-1412RSM, 2008 WL 189674 at *7 (W.D. Wash. Jan. 17, 2008).

Olmetti's only allegation which explicitly addressed N.P. Sherwood is that Sherwood discontinued his lower bunk assignment on March 28, 2018. The only evidence supporting this claim is the letter/summary provided by RN Johnson. As discussed, the summary incorrectly stated that N.P. Sherwood signed the order removing the low bunk alert. Olmetti relies on this erroneous summary. *See* Olmetti Response (ECF No. 78-1, PageID.1073, citing Exh. Y at pp. 30-31 (ECF No. 84-8, PageID.1441-1442). Olmetti also relies on an interrogatory answer from defendant Kent County, which states that it cannot identify who removed the low bunk alert,

[A]t some point, on or around March 28, 2018, at 5:21 a.m., Defendant believes the low bunk alert was removed. Medical staff personnel would presumably know why, as this was medical staff's decision, and thus Defendant cannot answer this subpart of the interrogatory, or who precisely made the decision (although records produced in this case indicate it may have been NP Sherwood and/or Melissa Furnace). . .

Interrogatory 6 (ECF No. 86-7, PageID.1689-1690); Olmetti Response at PageID.1073.

Based on this record, no reasonable jury could find that N.P. Sherwood removed the low bunk alert. Accordingly, defendant N.P. Sherwood should be granted summary judgment on this claim.

> **(b)    N.P. Sherwood should have continued the low bunk assignment given to Olmetti during his November incarceration because he had been away from KCCF for less than three days.**

Next, Olmetti contends that N.P. Sherwood should have given him a low bunk assignment for his physical disabilities because she had given him a low bunk assignment during the November incarceration and he had been out of the jail for only three days.   In context of an alleged constitutional violation for deliberate indifference to a serious medical need, a medical provider's decision to assign a prisoner to a lower or upper bunk involves the exercise of the provider's medical judgment.   As this Court previously explained in rejecting a plaintiff's deliberate indifference claim:

> [T]here is no evidence that NP Kelley ignored plaintiff's medical condition or exhibited "obduracy and wantonness" in treating him in July, August, and September 2018.  It is undisputed that she ordered x-rays, an EMG, a lower bunk accommodation, and ice for plaintiff's lower back. It appears that another medical provider continued the medical evaluation process by ordering an MRI.  "[W]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims that sound in state tort law." *Graham ex rel. Estate of Graham v. County of Washtenaw*, 358 F.3d 377, 385 (6th Cir. 2004) (internal quotation marks omitted). Plaintiff's disagreement with his physicians over the proper course of treatment "alleges, at most, a medical-malpractice claim, which is not cognizable under § 1983." *Darrah v. Krisher*, 865 F.3d 361, 372 (6th Cir. 2017). "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106.

*Gentry v. Corizon Health, Inc.*, No. 1:19-cv-258, 2020 WL 4353241 at *6 (June 4, 2020), R&R adopted, 2020 WL 4346908 (W.D. Mich. July 29, 2020) (emphasis added).  *See also*, *Hernandez-Perez v. Prince*, No. 17-2038-JDT-CGC, 2019 WL 3503479 at *3 (W.D. Tenn. Aug. 1, 2019) ("[T]he grievances attached to the complaint show that [the prisoner plaintiff] received x-rays, pain medication, an MRI, back support, a lower bunk pass, and a restriction from lifting weights over twenty pounds. When a plaintiff has received some medical treatment, 'federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law.' *Burgess v. Fischer*, 735 F.3d 462, 476 (6th Cir. 2013) (quoting *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976)).") (internal citation omitted); *Collins v. Warden, London*

*Correctional Institution*, No. 2:12-CV-1093, 2014 WL 1653130 at *9 (April 23, 2014), R&R

adopted, 2014 WL 2207706 (S.D. Ohio May 28, 2014) ("As to his lower-bunk restriction, Plaintiff

has not rebutted Defendant [Nurse] Bottorff's sworn assertions that she reviewed his history and

determined that he no longer was eligible for a low-bunk restriction. Further, Plaintiff does not

dispute that Defendant Bottorff maintained his restriction regarding how much time he was

required to stand at work. These are discretionary decisions made by a medical professional. The

Court will not second guess Defendant Bottorff's decision, based on her sound medical judgment,

to discontinue Plaintiff's prescription for Neurontin and cancel his lower-bunk restriction.").

Here, N.P. Sherwood originally assigned Olmetti a low bunk in November 2017

because he had an acute exacerbation of pain, had a shoulder fracture, had been hospitalized the

previous month, and had a slow gait.  Sherwood Dep. at PageID.996.  When asked if there was

something "more specific about this particular visit and assessment [on November 15, 2017] that

made you believe that at least at that time, you might order a low-bunk alert for him or a low-bunk

detail, a low floor?", N.P. Sherwood responded,

> So he had indicated a recent fracture of the shoulder. I didn't state how old
> that was, but his gait was slow. He had been in the hospital a month before, but
> didn't have anything to do necessarily with his pain, but my assessment was that he
> was having an acute exacerbation of his pain.

*Id*. at PageID.1005.

After his release, Olmetti engaged in conduct which resulted in his arrest and return

to KCCF three days later.  *See supra*.  N.P. Sherwood assessed Olmetti when he returned to KCCF

on March 26, 2018.  At that time, Sherwood determined that Olmetti did not need a low bunk alert

based on his physical condition at that time.  When asked "why did you reach that conclusion in

your medical judgement", Sherwood testified:

> He states -- for one, he states he feels well. That's encouraging, he does not
> have a headache, dizziness, bruises. He has some chronic aches and pains. His
> respirations are – they're non-labored, he moves all his extremities freely. His
> speech is clear and he is calm and conversant.

*Id*.  N.P. Sherwood's exercised her medical judgment and discretion when she determined that

Olmetti did not need a low bunk alert for his physical conditions.[4]  "[W]here a prisoner has

received some medical attention and the dispute is over the adequacy of the treatment, federal

courts are generally reluctant to second guess medical judgments and to constitutionalize claims

that sound in state tort law."  *Graham ex rel. Estate of Graham v. County of Washtenaw*, 358 F.3d

377, 385 (6th Cir. 2004) (internal quotation marks omitted).  Accordingly, defendant N.P.

Sherwood should be granted summary judgment on this claim.

> **(c)  N.P. Sherwood failed to provide Olmetti with the appropriate
> medical attention when he returned from the hospital.**

Olmetti alleged that when he returned from the hospital on April 3, 2018, unnamed

defendants refused to permit him to wear his sling, refused to let him use an incentive spirometer,

and refused to give him two mats.  Compl. at PageID.6.  N.P. Sherwood identified the medical

care which she provided to Olmetti after he returned from the hospital, citing the following medical

records:

> **4/3/18:** ordered sling to left upper extremity; incentive spirometer, two (2) mats;
> prescribed Norco; initiated a plan of treatment. (**ECF No. 74, PageID.895; ECF
> 74-5, PageID.964-965**);
>
> **4/4/18:** physically saw Plaintiff and assessed him for injuries from his fall (*Id*. at
> 964);
>
> **4/3/18 to 4/4/18:** All of Sherwood's Orders were physically entered by the medical
> staff into the jail's messaging and alert system so that Plaintiff would receive them
> and remained in effect through May 4, 2018. (**ECF No. 74-2, PageID.923-925**);

---

[4] As discussed, Olmetti was given a temporary low bunk assignment on March 26, 2018, because he was going through
alcohol withdrawal.

**4/19/18:** re-ordered left arm sling when notified that, despite her prior order, the custody staff may not have provided it or it was lost; ordered Tylenol #3 (for pain) (*Id*. at 965);

**4/20/18:** ordered an x-ray for Plaintiff's left upper extremity and examined him (*Id*. at 964-965);

**4/22/18:** provided a chest-x-ray to Plaintiff for his complaint of upper respiratory symptoms (*Id*. at 968). (which actually showed "**no pneumothorax seen**."[)]

Defendant Sherwood's Brief at PageID.2670-2671 (emphasis in original).

While Olmetti claims that defendants refused to permit him to wear his sling, refused to let him use an incentive spirometer, and refused to give him two mats, the records reflect that N.P. Sherwood issued orders for these items. N.P. Sherwood's orders prescribing these medical treatments and accommodations do not present evidence of deliberate indifference. *See Graham ex rel. Estate of Graham*, 358 F.3d at 385.[5] Accordingly, N.P. Sherwood should be granted summary judgment on this claim.

### 4.    Negligence

In addressing the undersigned's previous report which recommended dismissal of Count IV (gross negligence), the Court found that:

> There is no such thing as a claim for gross negligence, but negligence alone is a real cause of action. Olmetti has sufficiently pled such a claim in Count IV; it should not be dismissed.

Order (ECF No. 23, PageID.355). The Court continued,

> Under Michigan law, the Court must examine the substance of Olmetti's allegations to determine whether they sound in malpractice rather than negligence. *Jones v. Corr. Med. Servs., Inc.*, 845 F. Supp.[2d] 824, 845 (W.D. Mich. 2012) (citing *Dorris v. Detroit Osteopathic Hosp. Corp.*, 594 N.W. 2d 455, 464 (Mich. 1999)). "[A] claim that defendant did nothing in response to a known risk is a matter of negligence, not malpractice." *Id*. at 846 (citing *Bryant v. Oakpointe Villa Nursing Ctr.*, 684 N.W. 2d 864, 875 (Mich. 2004)). The heart of Olmetti's claim

---

[5] It appears that N.P. Sherwood followed the discharging doctor's recommendations. Even if N.P. Sherwood had not followed all of the recommendations, "[a] prison doctor's failure to follow an outside specialist's recommendation does not necessarily establish inadequate care." *Rhinehart v. Scutt*, 894 F.3d 721, 742 (6th Cir. 2018).

against Sherwood is that he told her of his need for a lower bunk because of his health problems and she failed to provide one. Taking his allegations as true, Sherwood did nothing in response to the known risk of Olmetti's conditions.

*Id*.

The Court relied on the *Jones* opinion, which explained the distinction between

negligence and medical malpractice as follows:

Michigan's Government Tort Liability Act sets out "gross negligence" as one exception to the general immunity it grants government employees. *See* Mich. Comp. L. § 691.1407(2) (granting immunity so long as employee's "conduct does not amount to gross negligence that is the proximate cause of the injury or damage"). But as noted above, Michigan statutes also set out various requirements for medical malpractice claims, left largely undefined in the statute. *See* Mich. Comp. L. §§ 600.2912-2912h. . . .

Under *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), a federal court deciding a state-law claim applies the state law for all substantive issues and federal law for procedural issues. *See also Felder v. Casey*, 487 U.S. 131, 151, 108 S.Ct. 2302, 101 L.Ed.2d 123 (1988) (applying *Erie* doctrine to pendent claims). Whether a claim sounds under state-law gross negligence or state-law medical malpractice is clearly a substantive issue to which Michigan law applies. This court will thus look to the Michigan courts' treatment of similar claims for guidance on this issue.

The courts of the State have held that the substance of a claim, rather than the words in which the claim is couched, determines whether it is in fact a malpractice claim subject to the statutory requirements. *See Dorris v. Detroit Osteopathic Hosp. Corp.*, 460 Mich. 26, 594 N.W.2d 455, 464 (1999) ("[A] complaint cannot avoid the application of the procedural requirements of a malpractice action by couching its cause of action in terms of ordinary negligence." (modification in original; quotation marks omitted)); *Adam v. Sisters of Bon Secours Nursing Care Ctr.*, No. 2007–001381, 2011 WL 3903146, *4 (Mich. Ct. App. Sept. 6, 2011) (holding gross negligence claim subject to malpractice requirements).

The Michigan Supreme Court has enumerated two key aspects that distinguish malpractice claims. First, the alleged negligence must have "occurred within the course of a professional relationship." *Dorris*, 594 N.W.2d at 465. That is, a "licensed health care professional, licensed health care facility, or the agents or employees of a licensed health care facility, were subject to a contractual duty that required that professional, that facility, or the agents or employees of that facility, to render professional health care services to the plaintiff." *Bryant v. Oakpointe Villa Nursing Ctr.*, 471 Mich. 411, 684 N.W.2d 864, 871 (2004).

17

Plaintiff's First Amended Complaint meets this factor by alleging that Dr. Abdellatif was "under contract with defendant Correctional Medical Services to provide medical care to the inmates of the Michigan Department of Corrections." (First Am. Compl., ECF No. 44, at 5.)

Second, the facts of a malpractice claim "raise questions involving medical judgment," rather than "issues that are within the common knowledge and experience of the jury." *Dorris*, 594 N.W.2d at 465. Where "the reasonableness of the action can be evaluated by a jury only after having been presented the standards of care pertaining to the medical issue before the jury explained by experts, a medical malpractice claim is involved." *Bryant*, 684 N.W.2d at 872. The courts have held that issues so attenuated from direct medical treatment as supervision and staffing decisions fall under the malpractice rules. *See, e.g., id.* (staffing and patient monitoring); *Bronson v. Sisters of Mercy Health Corp.*, 175 Mich. App. 647, 438 N.W.2d 276 (Mich.Ct.App.1989) (supervision and staffing decisions); *Waatti v. Marquette Gen'l Hosp.*, 122 Mich.App. 44, 329 N.W.2d 526 (Mich. Ct. App.1982) (whether seizure patient needs constant medical supervision); *Starr v. Providence Hosp.*, 109 Mich.App. 762, 312 N.W.2d 152 (Mich.Ct.App.1981) (adequate supervision). On the other hand, a claim that defendant did nothing in response to a known risk is a matter of negligence, not malpractice. *See Bryant*, 684 N.W.2d at 875 ("No expert testimony is necessary to determine whether defendant's employees should have taken some sort of corrective action"; "[t]he fact-finder can rely on common knowledge and experience.").

*Jones*, 845 F. Supp. 2d at 845-46.

While this Court determined that Olmetti's Count IV involves a claim of negligence, neither party has addressed this claim in a meaningful manner; they have not addressed the elements of the negligence claim, the facts relevant to those elements, or the impact of M.C.L. § 691.1407.  In this regard, N.P. Sherwood contends that "[p]laintiff failed to obtain any medical or expert support for his claim as required." Defendant Sherwood's Brief at PageID.908.  Contrary to defendant's contention, there is no need for an expert opinion.  As discussed in *Jones*, while this requirement is necessary in a medical malpractice action, it is not required in this negligence action, *i.e.*, no expert testimony is necessary to determine whether defendant's employees should have taken some sort of corrective action because the fact-finder can rely on common knowledge and experience.  *See Jones*, 845 F. Supp.2d at 846.   For his part, Olmetti continues to argue the

18

dismissed Count IV, *i.e.*, that N.P. Sherwood committed gross negligence.  *See* Olmetti's Response (ECF No. 78-1, PageID.1080-1081 (Argument §C "Defendant Sherwood Acted in a Grossly Negligent Manner")).  Neither party has addressed the state law claim presented in Count IV. Accordingly, N.P. Sherwood's motion for summary judgment on the negligence claim should be denied.

### III.    Dismissal of state law claim

In the alternative, if the Court adopts the recommendation to grant summary judgment as to the Fourteenth Amendment claim against N.P. Sherwood alleged in Count I, then the undersigned recommends dismissing the remaining state law negligence claim alleged against N.P. Sherwood in Count IV.  Here, the Court exercised its supplemental jurisdiction over Olmetti's state law claim pursuant to 28 U.S.C. § 1367, presumably because that claim was intimately related to the alleged Fourteenth Amendment violations.  *See* 28 U.S.C. § 1367(a) ("the district court shall have supplemental jurisdiction over all other claims that are so related to the claims in the action within such original jurisdiction that they form a part of the same case or controversy").  The dismissal of Olmetti's federal claims against NP Sherwood requires the Court to re-examine the issue of supplemental jurisdiction for state law claims against her. Under 28 U.S.C. § 1367(c)(3), a district court may decline to exercise supplemental jurisdiction over a claim if the court "has dismissed all claims over which it has original jurisdiction."   Once a court has dismissed a plaintiff's federal claim, the court must determine whether to exercise, or not to exercise, its supplemental jurisdiction under § 1367. *See Campanella v. Commerce Exchange Bank*, 137 F.3d 885, 892-893 (6th Cir. 1998).

In determining whether to retain supplemental jurisdiction over Olmetti's state law claim, "[a] district court should consider the interests of judicial economy and the avoidance of

multiplicity of litigation and balance those interests against needlessly deciding state law issues." *Landefeld v. Marion General Hospital, Inc.*, 994 F.2d 1178, 1182 (6th Cir. 1993). Ordinarily, where a district court has exercised jurisdiction over a state law claim solely by virtue of supplemental jurisdiction and the federal claims are dismissed prior to trial, the court will dismiss the remaining state law claims. *See Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 521 (6th Cir. 2007) ("Generally, once a federal court has dismissed a plaintiff's federal law claim, it should not reach state law claims."). "Residual jurisdiction should be exercised only in cases where the interests of judicial economy and the avoidance of multiplicity of litigation outweigh our concern over needlessly deciding state law issues." *Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006) (internal quotations omitted). Dismissal, however, remains "purely discretionary." *Carlsbad Technology, Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) (citing 28 U.S.C. § 1367(c). Here, the undesigned finds no reason for this Court to decide a state law claim of negligence against N.P. Sherwood. This additional state claim will extend the trial, involve more lengthy jury instructions, and invite potential jury confusion with respect to the elements of the federal and state claims, *e.g.*, applying the different versions of immunity applicable under state and federal law. Accordingly, if the Court adopts the recommendation granting N.P. Sherwood summary judgment on all federal claims, then the Court should dismiss Olmetti's state law negligence claim against Sherwood.

## IV.    Recommendation

For the reasons set forth above, I respectfully recommend that defendant N.P. Sherwood's motion for summary judgment (ECF No. 74) be **GRANTED** as to the Fourteenth Amendment Claim alleged in Count I and **DENIED** as to the negligence claim alleged in Count IV.

In the alternative, if the Court grants defendant Sherwood's motion for summary judgment on the federal claims alleged in Count I, then I recommend that Olmetti's state law negligence claim alleged against defendant Sherwood in Count IV be **DISMISSED** pursuant to 28 U.S.C. § 1367.

Dated: July 1, 2022                              /s/ Ray Kent
                                                 RAY KENT
                                                 United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report.  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).