UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


LONNIE OLMETTI,

                Plaintiff,

v.

KENT COUNTY, *et al.*,

                Defendants.

_____/

Case No. 1:20-cv-395

Hon. Hala Y. Jarbou

**REPORT AND RECOMMENDATION**

Plaintiff Lonnie Olmetti ("Olmetti") was incarcerated at the Kent County Correctional Facility ("KCCF").  Olmetti, through counsel, has filed a lawsuit against a number of defendants for alleged violations of his civil rights pursuant to 42 U.S.C. § 1983 and state tort law.  Olmetti's complaint named seven defendants: Kent County; N.P. Joanne Sherwood; and Kent County Sheriff's Department employees Deputies Tyler King, Justin Linsea; Justin Mezsets, Shane Cole, and Eric Santiago.  Compl. (ECF No. 1, PageID.1-2).[1]  This matter is now before the Court on a motion for summary judgment filed by defendants Kent County, King, Linsea, Cole, Santiago, and Mezsets (ECF No. 68).

    **I.**      **Background**

Olmetti's claims arose when he was held as a pretrial detainee at the KCCF.  *Id*. at PageID.3.  During this time, Olmetti stated that he was 60 years old, was disabled collecting SSI (supplemental security income), had "severe back problems that went back for decades," had

---

[1] Olmetti also lists "John/Jane Does" whom he refers to as unknown "sheriff deputies or corrections officers" working at the KCCF.  *Id*. at PageID.2.  He has not identified these "Doe" defendants.

"severe arthritis," and "was in need of knee and hip replacements." *Id*. On November 10, 2017, Olmetti was "booked" at the KCCF for a criminal charge of assault with intent to commit murder. *Id*. He "bonded out" on or about March 23, 2018, was arrested on or about March 25, 2018, and was booked again at the KCCF. *Id*. Booking records from March 26, 2018, noted that Olmetti had a "bad back", including spinal stenosis, bone spurs, and a bulging and herniated disc. *Id*. at PageID.4. According to the complaint, "the March 26, 2018 booking records clearly indicate that during [p]laintiff's incarceration from November 2017 to March 23, 2018, [p]laintiff had a lower bunk assignment due to his significant and obvious medical conditions involving his back and spine." *Id*.

On or about March 26, 2018, Deputy Santiago classified Olmetti to be housed in general population. *Id*. Santiago made no mention of Olmetti's severe medical conditions and did not ensure that he was given a low bunk detail. *Id*. Olmetti alleged that he "repeatedly made it known to [d]efendants and the corrections staff that he had severe back problems; that he had previously been assigned a lower bunk detail while at the KCCF; and again needed a lower bunk detail because of his serious back problems." *Id*. However, Olmetti was only given a "lower bunk/lower level assignment" from March 26, 2018 through March 28, 2018. *Id*.

The next day, March 29, 2018, Deputy Santiago re-classified Olmetti for purposes of housing. *Id*. at PageID.5. That same day, Deputy Cole moved Olmetti to a new cell. *Id*. Olmetti was not given a low bunk detail. *Id*. Deputy Mezsets was aware of Olmetti's serious medical needs and prior low bunk details, but did not ensure that he received a low bunk detail. *Id*. Five days later, on April 3, 2018, Olmetti fell out of the top bunk, suffered serious injuries, and was rushed to the hospital. *Id*. Despite Olmetti's complaints, Deputies King and Linsea handcuffed him in an "extremely tight manner" and "man-handled" Olmetti when they escorted him to the

hospital.  *Id*.  Olmetti was treated for a scalp laceration, fractured ribs, and received "a sling for comfort in the setting of his rib fractures."  *Id*.  When Olmetti returned from the hospital on April 3, 2018, unnamed defendants refused to permit him to wear his sling, refused to let him use an incentive spirometer, and refused to give him 2 mats.  *Id*.  Olmetti also alleged that, "during the time [p]laintiff spent in the KCCF, he has witnessed corrections officers throw away inmate KITES."  *Id*.

Olmetti's complaint alleged: that "all defendants" were deliberately indifferent to his serious medical needs in violation of the 14th Amendment (Count I); that all defendants deprived him of life's necessities in violation of the 14th Amendment (Count II); that defendants King and Linsea used unreasonable force in violation of the 14th Amendment (Count III); that all defendants were grossly negligent (Count IV); and that defendant Kent County engaged in constitutional violations (Count V).  *Id*. at PageID.6-12.[2]

## II.    Defendants' motion for summary judgment

### A.    Legal standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Rule 56 further provides that a party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

---

[2] The Court previously dismissed Count II directed at defendant N.P. Sherwood.  *See* Order (ECF No. 23, PageID.357).

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties'

burden of proof in a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case.  Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment.  The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted).  "In deciding a motion for summary judgment,

the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving

party."  *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

### B.    Discussion

### 1.    Defendant Deputy Mezsets

At his deposition, Olmetti could not explain why he was suing Deputy Mezsets.

When asked, "Why did you sue Deputy Mezsets?", Olmetti responded:

> I don't know.  I can't -- you know, I can't remember this particular guy at the time because, you know, we have covered a lot, and I -- I would have to read my notes to figure out which guy this is and which situation.  You would have to ask me a question.

Olmetti Dep. (ECF No. 69-6, PageID.606).  When asked about his notes, Olmetti said the notes

were elsewhere:

> They are at home, so I can't tell you, you know, verbatim, but, you know, I have information on each one of these guys.

*Id*.

Later, when asked "[s]itting here right now, do you recall any of your interactions

with Justin Mezsets?", Olmetti again failed to provide an answer to a basic question, stating

> I don't know.  You know, we are getting -- you know, you keep popping around and now you are coming back and asking me the same question.  I told you I -- I know who the guy -- I know his name, but I can't put together a situation with him right now.

*Id*. at PageID.607.

At his deposition, Deputy Mezsets testified that on April 3, 2018, he discovered Olmetti in the cell and described the scene as follows:

> Mr. Olmetti was laying with his head towards the door on his back with a pool of blood underneath his head and his bunky was standing -- cellmate was standing next to the door by the toilet. They're kind of right next to each other. He was standing there.

Mezsets Dep. (ECF No. 69-4, PageID.583).  Mezsets testified that Olmetti appeared "dazed and moaning."  *Id*.  When asked, "[w]hat do you do next?", Mezsets responded,

> I grab my radio and I call what we would call as a signal wight [sic] to medical emergency. We call in for deputies and all available medical staff to respond to the area.

*Id*.  Mezsets estimated that the others arrived in "less than a minute."  *Id*.

Prior to this incident, Olmetti testified that he does not know or cannot remember if he even told Mezsets that he previously had a lower bunk:

> Q.    All right.  Next person.  Did you tell Deputy Mezsets that you previously had a lower bunk?

> A.    I don't know.  I told you earlier.  I can't remember.

Olmetti Dep. (ECF No. 90-4, PageID.1909).

Olmetti has not articulated any claim against Deputy Mezsets. Based on this record, Mezsets found Olmetti in the cell on April 3rd and reported the incident. There is no evidence to support any constitutional claims against Mezsets.  Accordingly, defendant Mezsets' should be granted summary judgment on all Counts.

> 2.    **Fourteenth Amendment claims for deliberate indifference to a serious medical need (Count I)**

Olmetti seeks relief pursuant to 42 U.S.C. § 1983, which "provides a civil cause of action for individuals who are deprived of any rights, privileges, or immunities secured by the Constitution or federal laws by those acting under color of state law." *Smith v. City of Salem, Ohio*, 378 F.3d 566, 576 (6th Cir. 2004). To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

During the relevant time period, Olmetti was in the custody of KCCF as a pre-trial detainee. "Although the Eighth Amendment's protections apply specifically to post-conviction inmates, the Due Process Clause of the Fourteenth Amendment operates to guarantee those same protections to pretrial detainees as well." *Miller v. Calhoun County*, 408 F.3d 803, 812 (6th Cir. 2005) (internal citation omitted). It is well established that an inmate has a cause of action under § 1983 against prison officials for "deliberate indifference" to his serious medical needs, since the same constitutes cruel and unusual punishment proscribed by the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97 (l976). "Whether a convicted prisoner or a pretrial detainee, deliberate indifference to one's need for medical attention suffices for a claim under 42 U.S.C. § 1983." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 895 (6th Cir. 2004).

A viable Eighth Amendment claim consists of an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A court considering such a claim must ask both if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation and if the officials acted with a sufficiently culpable state of mind. *Hudson v. McMillian*, 503 U.S. 1, 8 (1992). The objective component requires the infliction of serious pain or failure to

treat a serious medical condition.  *Id.* at 8-9.  "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Id.*  at 9.

The subjective component requires that the defendant act with deliberate indifference to an inmate's health or safety.  *See Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991).  To establish the subjective component, the plaintiff must show that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.  Mere negligence in diagnosing or treating a medical condition does not constitute an Eighth Amendment violation.  *Id.* at 835. "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause."  *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

### a.    Deputy Santiago

Olmetti alleged that when he returned to the KCCF on March 29, 2018, Deputy Santiago re-classified him for housing.  Compl. at PageID.4.  The day before Santiago re-classified Olmetti, the jail's health care personnel had terminated Olmetti's temporary lower bunk alert.  *See* Jail Records (ECF No. 70-2, PageID.669-670) (lower bunk (LB) only alert from March 26, 2018 02:56 to March 28, 2018 05:21).  At the time Santiago assigned housing, he noted that Olmetti "claims back issues, shingles, and acid reflux" and that he had a lower bunk during a prior incarceration. *See* Initial Classification (March 29, 2018) (ECF No. 70-4); Medical Alerts (ECF No. 69-13); NP Sherwood Dep. (ECF No. 69-1, PageID.556, 560); Olmetti Dep. (ECF No. 69-6, PageID.267).  In this regard, Santiago testified as follows:

Q. Okay. Do you know if he had a low-bunk alert when you sent him from D-1A to D-2B?

A. The lower bunk alert and withdrawal alerts were closed.

Q. Okay. And how do you know that?

A. Because they were not open or active when -- when it was my time to do the face-to-face interview with Mr. Olmetti.

Santiago Dep. (ECF No. 69-3, PageID.572).

In response to an interrogatory which asked, "Subsequent to Plaintiff's incarceration at the Kent County Jail on or about March 25, 2018, were you made aware of any medical conditions of Plaintiff or aware of his need for a low bunk detail?", Santiago objected and provided the following response:

Subject to those objections, Defendant believes his only interaction pertaining to Defendant would have been the classification that Defendant completed of Plaintiff on or about March 29, 2018. At that time, medical staff had already concluded that Plaintiff's lower bunk alert should be removed, and thus Defendant was not aware of any further need for a lower bunk alert for Plaintiff (for any medical reason or other). Relying upon that professional medical judgment, Defendant classified Plaintiff.

Santiago Discovery Answers (ECF No. 71-4, PageID.759).

Based on this record, Deputy Santiago was aware of the medical staff's determination that Olmetti did not qualify for LB alert.  Santiago was entitled to rely on the medical staff's professional assessments that Olmetti did not need a lower bunk detail.  "[W]e have recognized that a non-medically trained officer does not act with deliberate indifference to an inmate's medical needs when he 'reasonably deferred to the medical professionals' opinions." *Greene v. Crawford County, Michigan*, 22 F.4th 593, 608 (6th Cir. 2022); *Jones v. County of Kent*, No. 1:20-cv-36, 2022 WL 1284107 at *16, -- F. Supp. 3rd -- (W.D. Mich. April 29, 2022) ("A non-medically trained official is not deliberately indifferent when he defers to a 'medical recommendation that he reasonably believes to be appropriate, even if in retrospect that

recommendation was inappropriate.'"). Accordingly, Deputy Santiago should be granted summary judgment on Count I.

### b.    Deputy Cole

In his complaint, Olmetti alleged that,

> Upon information and belief, on March 29, 2018, Defendant Cole moved Plaintiff to a new cell; wherein Plaintiff was not given a low bunk detail; and despite Plaintiff's protests regarding same, Defendant Cole did nothing to ensure that Plaintiff got a low bunk detail, but told Plaintiff he just had to deal with it.

Compl. at PageID.5.

Olmetti testified about Deputy Cole as follows:

> So Cole comes from the outside, you know, with his paper to transport me. I walk out and I says look, I says, I have a lower bunk and, you know, I says I am not leaving here until I know that I have a lower bunk. And he says, you know, I don't know anything about that. I says well, you know this, I'm not leaving here, I will just go back in the cell. So he calls up to D-2B and talks to whoever. There is two guards there because -- I know that because I went there and I talked to both of those guards. But, what happened, he calls he says, hey, I am here with Olmetti, he says he has got lower bunk detail. It's in the computer. Everyone knows that. Well, I don't think they checked. They says hey, wait a minute, there is a problem. So I waited there with Cole and the guy – I don't know who he was because I never really saw him that much. I was in solitary confinement. You never got let out for anything. They fed you through the door. So you know, I didn't really know what was going on out there. So after about 15, 20 minutes Cole says hey, go back to your cell so I can figure this out. So I'm sitting in there, it must have been – I don't know – 45 minutes to an hour and a half, because there is no clock or anything. So you just got to – you know, it was a long time. So finally they call me up again. Olmetti, pack up, you are going upstairs. So I come up. Okay. Lower bunk detail. Yep, it's all set. That is exactly what he said. So we go up in there, I go up, they says you are in cell number 8. So I go in there and there is Chino in the lower bunk. I said hey, man, I got lower bunk detail. He says yeah, I got lower bunk detail too. So I go back out, I said listen, I says, I am in there with Chino, because I knew him from before, I says he says he has got lower bunk detail. I says check and see if he has got a lower bunk detail. He says listen, we are busy. You know, shift change is coming up. He says Olmetti, I don't know what you're talking about. Well, Cole had said I had lower bunk detail. I go talk to the guy, I said look, you got -- you got what you got, take it or leave it. So I'm like hey, wait a minute.

Olmetti Dep. (ECF No. 69-6, PageID.603).

When asked to clarify Deputy Cole's involvement in transporting him to the new

cell, Olmetti testified:

Q.      We started this on Shane Cole and I just want to make clear –

A.      He delivered me to D-2B.

Q.      I am totally with you. When he delivered you, though, I want to make clear,
is that when Shane Cole and your interaction with him stopped?

A.      Well, he was there.  And I went back into the room, I come back out to tell
these guards and Cole, Cole is gone.

Q.      Okay.  Cole is gone.

A.      Cole had left me.

Q.      Okay.  Cole does the transport.

A.      Yeah, and he hit –

Q.      He puts you in the cell and he is gone.

A.       – the high road –

Q.      Okay.

A.       – and left me high and dry.

*Id*.

Counsel again attempted to have Olmetti clarify his claim against Deputy Cole,

Q.      All right. Is it your -- are you suing Shane Cole because of those interactions
when he transported you from D-1 to D-2B?

A.      Well, he lied.

Q.      No.  Yes, then, is that why you are suing him?

        MR. CABOT:· Object to the form.

A.      I -- there is a number of reasons why I am suing him, but he is the person
that set me up to be disappointed.  When I got there, the two guards said they knew
nothing about it, and he talked to those people supposedly on the phone from D-1.

10

I was standing right there with the other guard.   It was just us three. So after they sent me back to my cell to wait --

BY MR. KONWINSKI:

Q.      I just want to make clear for the record though.  When you get to D-2B and you literally walk -- does he escort you all of the way to the cell or does his involvement –

A.      No, he is standing there talking to the two guards.

*Id*.

When counsel asked Olmetti, "So Shane Cole's interaction with you stopped at the command center in the dayroom when he continued to talk to the two floor deputies and you walked to your cell?", Olmetti responded,

A.      Yeah.  Yeah, and –

Q.      And then you –

A.      As soon as I hit the room he hit the high road, he was gone.

*Id*. at PageID.604.

Eventually, Olmetti admitted that he had no interactions with Deputy Cole other than transport:

Q.      Do you know -- let me try and ask you again.  Based on your personal knowledge, things that you recall, do you know if you had any interactions with Shane Cole besides –

A.      No.

Q.      -- the transport?

A.      No.

*Id*.

Finally, Olmetti testified that Deputy Cole stated that he had a lower bunk,

Q.      Okay.  Was it your impression that Deputy Cole thought you had a lower bunk?

MR. CABOT: Objection, speculation.

THE WITNESS: Oh, yeah.  He said that, "You got a lower bunk.  It's all taken care of.  Once I left that door, that's it, you can't go back.

BY MR. KONWINSKI:

Q.      I'm with you, but it was your impression, based upon your observations of Deputy Cole, that he did, in fact, think you had a lower bunk?

MR. CABOT: Objection, speculation.

THE WITNESS:  Yeah.  I would say yes.

*Id*. at PageID.635.

Deputy Cole testified that Olmetti did not mention the need for a low bunk.  Cole Dep. (ECF No. 69-5, PageiD.592).  According to Cole, Olmetti's only complaint was that he did not want "to be put on display" at the new cell.  *Id*.  Cole stated that he escorted Olmetti to the cell assigned to him, removed his handcuffs, secured the cell, and left.  *Id*.

Based on this record, Olmetti has failed to establish that Deputy Cole met the subjective prong of a deliberate indifference claim for failing to assign him a lower bunk. Cole's interaction with Olmetti was to transport Olmetti to a new cell.  It is undisputed that Cole did transport Olmetti to the cell assigned to him.  Viewing the evidence in the light most favorable to the non-movant, Cole discussed assigning Olmetti a lower bunk, Cole took action to address Olmetti's claim that he was assigned a lower bunk, and left the area after transporting him to the new cell. Accordingly, Deputy Cole should be granted summary judgment on Count I.

### c.      Deputies King and Linsea

Olmetti's only claims against Deputies King and Linsea arose after the accident, *i.e.*, they used excessive force in transporting him to and from the hospital after his accident, and

they were allegedly involved in creating inhumane prison conditions after Olmetti returned from the hospital.  *See* discussion, *infra*.  Accordingly, Deputies King and Linsea are entitled to summary judgment as to Count I.

### 3.    Fourteenth Amendment claims for denial of life's necessities (Count II)

As this Court previously stated,

> Count II alleges a Fourteenth Amendment violation based on the prison conditions Olmetti was subjected to after he returned from the hospital.  Inhumane prison conditions are prohibited by the Eighth Amendment, and the Fourteenth Amendment extends those protections to pretrial detainees.

Order (ECF No. 23, PageID.353).

> The Eighth Amendment provides an inmate the right to be free from cruel and unusual punishment.  The Due Process Clause of the Fourteenth Amendment provides the same protections to pretrial detainees.  *See Richko v. Wayne Cty.*, 819 F.3d 907, 915 (6th Cir. 2016).  This Court has historically analyzed Fourteenth Amendment pretrial detainee claims and Eighth Amendment prisoner claims "under the same rubric."  *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013).

*Richmond v. Huq*, 885 F.3d 928, 937 (6th Cir. 2018).

> An Eighth Amendment conditions-of-confinement claim consists of two prongs, both of which must be met to merit relief. From an objective standpoint, the deprivation must be "sufficiently serious," resulting in a denial of the "minimal civilized measure of life's necessities."  *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Spencer v. Bouchard*, 449 F.3d 721, 728 (6th Cir.2006), *abrogated on other grounds* by *Jones v. Bock*, 549 U.S. 199, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007).  Also, the prison official's "state of mind [must be] one of deliberate indifference to inmate health or safety."  *Spencer*, 449 F.3d at 728 (internal quotation and citation omitted).

*Francis v. Altiere*, 491 Fed. Appx. 539, 541 (6th Cir. 2012).

Here, Olmetti has set forth two allegations relevant to this claim:

> 38. When Plaintiff returned from the hospital on April 3, 2018, Defendants refused to permit him to wear his sling, refused to let him use an incentive spirometer, and refused to give him 2 mats.

13

39. Also during the time Plaintiff spent in the KCCF, he has witnessed corrections officers throw away inmate KITES.

Compl. at PageID.6.

### a.  Defendants refused to allow Olmetti to use medical equipment

Olmetti claims that all defendants denied him medical equipment.  However, he provides no factual basis for this claim.  At his deposition, Olmetti conceded that he has no knowledge that any of the deputies refused to give him medical devices after he returned from the hospital.  *See* Olmetti Dep. (ECF No. 69-6, PageID.616-617).  When asked, "Did you ever personally witness one of those deputy defendants not give you that [*i.e.*, the sling, the incentive spirometer, and the two mats] or take away those items?", Olmetti responded "No."  *Id*.[3]  Olmetti testified that Deputies King and Linsea took his sling, spirometer, and prescription for seven days of morphine, and proceeded to "intake."   Olmetti Dep. (ECF No. 90-2, PageID.1869); *Id*. (ECF No. 90-4, PageID.1905).  When asked, "Did you take [sic] see Deputy Linsea or King give those items to someone?," Olmetti responded,

> You know, I – I am going to tell you I don't remember, but I think that they were on the desk of the nurse and I don't know what happened there.  Like I say, they ended up – because when I got up [sic] – released, there was the stuff in my property they gave me, and I thought what is this.  You know, I didn't understand it, but that's how it worked.

*Id*. (ECF No. 90-4, PageID.1905).  Despite a medical practitioner's order on April 4, 2018 allowing Olmetti to have the sling, the spirometer and two mats, Olmetti did not recall receiving any of it, stating that "the stuff that was given to me at the hospital ended up in the property."  *Id*. at PageID.1906.

Olmetti further testified that,

---

[3] The Court notes that the items are identified at Olmetti's deposition at pages 270-71 (ECF No. 69-6, PageID.616-617).

Q.      So besides Nurse Practitioner Sherwood then, do you have any basis to believe that Tyler King, Justin Linsea, Shane Cole, Eric Santiago, or Justin Mezsets was the reason --

A.      Yes.

Q.      -- that you did not receive those items?

A.      Yes.

Q.       And what is your basis?

A.      Well, I told you about what happened at the hospital.  I told you about the ride home.  And I told you that everything disappeared once I got to intake.  So what do you want?

Q.      Well, I guess my question is, is why – what is your basis to believe that one of those defendants that you that you named –

A.      No one else could have done it.  They had it.  It was there and then it was gone.  And then it ended up in my property.  How did it get there?  I don't know.

Q.      Okay.  And do you have any basis besides that to believe that it was one of the defendants?

A.      You are kidding, aren't you?

Q.      No.
                MR. CABOT:  Just answer.

BY MR. KOWINSKI:

Q.      No.  This is your lawsuit, sir.

A.      Like I say, I think that each one of them are guilty in their own part.  I just can't give you exact [sic] reason, but they are all players in what happened to those items.

*Id.* (ECF No. 69-6, PageID.617).

        While Olmetti testified that the medical equipment was placed on a nurse's desk when he returned to KCCF, he stated that it was sent to his property and he did not see the equipment again until he was released from the facility.  While Olmetti stated that he did not

15

receive the two mats for his cell, he provided no evidence that the defendant deputies failed to provide him the mats.  Olmetti's testimony does not establish that Deputies Mezsets, Santiago, Cole, King or Linsea deprived him of the hospital medical equipment or mats.  Accordingly, Deputies Mezsets, Santiago, Cole, King or Linsea should be granted summary judgment with respect to Olmetti's claim in Count II that they refused to permit him to wear his sling, refused to let him use an incentive spirometer, and refused to give him two mats.

### b.      Defendants threw away inmate kites

Olmetti provided no evidence that the deputy defendants threw away inmate kites as alleged in the complaint.  At his deposition, Olmetti testified as follows,

Q.     .  .  .  The question is which corrections officers threw away inmate kites?

A.      I got his name at home.  I can't tell you right now, but I have it written down. That I sent that to Shawn, but I – I think I have a copy or his name is written on something that I might have at home.  I'm not sure.  If I'm not -- Shawn has it in his office.

BY MR. KONWINSKI:

Q.      But it was -- if I'm hearing you correctly then –

A.      I got witnesses for it too.

Q.      Hold on.  Well, we will get to that in a second.  If I am hearing you correctly, it was not Tyler King, Linsea, Cole, Santiago or Mezsets –

A.      No.

Q.      -- that threw away the kites?

A.      No.

Olmetti Dep. at PageID.617.

Olmetti has no evidence to support his claim that the deputy defendants threw away any inmate kites.  Accordingly, Deputies Mezsets, Santiago, Cole, King and Linsea should be

granted summary judgment with respect to Olmetti's claim in Count II that they threw away inmate kites.

### 4.    Fourteenth Amendment claims for excessive force (Count III)

In this count, Olmetti alleged that Deputies King and Linsea engaged in excessive force while escorting him to and from the hospital on April 3, 2018.  Olmetti alleged: that King and Linsea handcuffed him in an extremely tight manner despite his complaints that the handcuffs were too tight; that they did not loosen the handcuffs; that they refused to un-handcuff Olmetti at the hospital; and that when they took Olmetti from the hospital to the transport vehicle "they man-handled Plaintiff by dragging and pushing and pulling at him and laughing at him."  Compl. at PageID.5-6.

As a pretrial detainee, Olmetti's claim arises under the Substantive Due Process Clause of the Fourteenth Amendment.  *See Kingsley v. Hendrickson*, 576 U.S. 389 (2015).  The relevant inquiry is whether the force purposely or knowingly used against the prisoner was objectively unreasonable.  *Id*. at 396-400; *see also, Coley v. Lucas County*, 799 F.3d 530, 538 (6th Cir. 2015) (citing *Kingsley*) ("The Supreme Court has recently clarified, however, that when assessing pretrial detainees' excessive force claims we must inquire into whether the plaintiff shows that the force purposely or knowingly used against him was objectively unreasonable.") (internal quotation marks omitted).

As this Court explained,

> This inquiry is "highly fact-dependent" and "must take into account the 'perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight.' " *Coley*, 799 F.3d at 538 (quoting *Kingsley*, 576 U.S. at 397). It must also consider the government's "legitimate interests" in managing correctional facilities in order "to preserve internal order and discipline and to maintain institutional security." *Coley*, 799 F.3d at 538 (internal quotations omitted). The *Kingsley* Court further provided:

> Considerations such as the following may bear on the reasonableness or unreasonableness of the force used: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting. We do not consider this list to be exclusive. We mention these factors only to illustrate the types of objective circumstances potentially relevant to a determination of excessive force.

*Kingsley*, 576 U.S. at 397 (internal citations omitted). Both *Kingsley* and *Coley* stated that "pretrial detainees cannot be subjected to 'the use of excessive force that amounts to punishment,' precisely because they 'cannot be punished at all.' " *Coley*, 799 F.3d at 538 (quoting *Kingsley*, 576 U.S. at 400). "The calculus of reasonableness must embody allowance for the fact that [jail] officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97. The analysis therefore includes a "built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case." *Mullins v. Cyranek*, 805 F.3d 760, 766 (6th Cir. 2015) (internal quotation marks omitted). At bottom, a court's focus is not on the extent of the injury, but "whether 'gratuitous violence' has been inflicted." *Coley*, 799 F.3d at 539 (quoting *Pigram ex rel. Pigram v. Chaudoin*, 199 F. App'x 509, 513 (6th Cir. 2006)).

In a case such as this, involving multiple uses of force, the court must assess the reasonableness of each use of force "in chronological 'segments.' " *Hanson v. Madison Cnty. Detention Ctr.*, 736 F. App'x 521, 529 (6th Cir. 2018) (quoting *Dickerson v. McClellan*, 101 F.3d 1151, 1162 (6th Cir. 1996)).

*Churchwell v. Rich*, No. 1:19-cv-819, 2021 WL 3195824 at *4-5 (June 29, 2021), R&R adopted, 2021 WL 3187948 (W.D. Mich. July 28, 2021).

### a.    Deputies King and Linsea refused to loosen Olmetti's handcuffs

A plaintiff may state a cause of action for excessive force based upon tight handcuffs. *See Lyons v. City of Xenia*, 417 F.3d 565, 575 (6th Cir. 2005). "In order for a handcuffing claim to survive summary judgment, a plaintiff must offer sufficient evidence to create a genuine issue of material fact that: (1) he or she complained the handcuffs were too tight; (2) the officer ignored those complaints; and (3) the plaintiff experienced 'some physical injury'

resulting from the handcuffing." *Morrison v. Board of Trustees of Green Township*, 583 F.3d 394, 401 (6th Cir. 2009).   An actual injury, more than just subjective pain, must result from the handcuffing of the plaintiff. *See Rudolph v. Babinec*, 939 F.3d 742, 752 (6th Cir. 2019) ("a subjective recounting of pain without some corroboration is not enough").

It is undisputed that Deputy King handcuffed Olmetti while he transported Olmetti to and from the hospital.  Olmetti Dep. (ECF No. 69-6, PageID.621).   Olmetti testified that he complained that the handcuffs were too tight and asked King to loosen them.  *Id*. at PageID.633. The drive to the hospital lasted five minutes or so.  Olmetti Dep. (ECF No. 90-4, PageID.1921). Olmetti admitted that he did not suffer any physical injury as a result of the handcuffing.  Olmetti Dep. (ECF No. 69-6, PageID.614).   When asked, "did you sustain any injury because they handcuffed you?", Olmetti responded "[t]he injury I substained [sic] is the pain." *Id*.  When Olmetti returned to KCCF, he was taken to Intake and evaluated by medical staff. *Id*. at PageID.615. There is no indication in Olmetti's medical records that he sustained an injury from the handcuffing or that he complained to medical staff about suffering an injury.  *See* N.P. Sherwood Dep. (ECF No. 69-1, PageID.559).

Olmetti has failed to establish that he suffered any physical injury from being placed in tight handcuffs.  Accordingly, Deputies King and Linsea should be granted summary judgment with respect to Olmetti's claim in Count II that they used excessive force in handcuffing him.

### b.    Deputies King and Linsea "manhandled" Olmetti

At his deposition, Olmetti testified that Deputies King and Linsea "manhandled me around".  Olmetti Dep (ECF No. 69-6, PageID.621).  When defendants' counsel asked Olmetti why he was suing Deputy Linsea, Olmetti testified:

A.      He was there, and their behavior towards me was both the same.  They were aggressively rude and, like I say, they manhandled me around.  They kept telling the nurse I was a convicted felon, I don't deserve any medication.  He is going to prison.  You know, all of this stuff about, you know, what a terrible person I am, and, you know, we have to handcuff him because we don't want him trying to escape, you know, this kind of stuff.

Q.      So you are suing Deputy Linsea because he was making vulgar comments towards you and the medical personnel and because he participated in, I think you said, shoving you around?

A.      Yeah, like I say, they were –

Q.      Well –

A.      -- two peas in a pod, put it that way.

*Id*. at PageID.621.

Olmetti further stated,

They both were pulling at me and, you know, it's like -- I don't understand why they did that, because that's one of the things I was in the hospital for.

*Id*. at PageID.622.

According to Olmetti, Deputy King was on one side and Deputy Linsea was on the other side.  *Id*. at PageID.633.  The deputies were "pretty big", they were pulling him across the parking lot, "laughing and chuckling," while Olmetti said "Hey, take it easy, you know."  *Id*. Olmetti also pointed out that the deputies were "jerking me down the road" even thought "they knew he was in the hospital for my arm being damages and everything else just to try to hurt me." *Id*.

Defendants contend that Deputies King and Linsea used *de minimis* force, pointing out that Olmetti did not report any specific injury resulted from the manhandling.  *See* N.P. Sherwood Dep. (ECF No. 69-1, PageID.559) (when asked, "did Mr. Olmetti ever claim to you that

he had any injuries based upon Deputy King and Linsea's actions in the transport to and from

Spectrum Health?", N.P. Sherwood responded, "Not that I know of.  I do not know of any.").

"An inmate who complains of a 'push or shove' that causes no discernible injury

almost certainly fails to state a valid excessive force claim." *Wilkins v. Gaddy*, 559 U.S. 34, 38

(2010).  *See Tuttle v. Carroll County Detention Center*, 500 Fed. Appx. 480, 482 (6th Cir. 2012)

(an inmate's "bare-bones allegation that the female deputy "*grabbed* my privates and *squeezed*

*them really hard*" (emphasis added) is simply too subjective and vague to state an Eighth

Amendment violation"); *Oben v. Delacruz*, No. 1:20-cv-1050, 2021 WL 4943169 at *1 (Sept. 22,

2021), R&R adopted, 2021 WL 4941011 (W.D. Mich. Oct. 22, 2021) (finding no constitutional

violation where an officer "grabbed" a prisoner's wrists and "forcefully" pulled the prisoner's arms

through the slot in his cell door, but there was no evidence that the prisoner suffered any injury).

The Court, however, does not find these decisions applicable to the present case.  It

is undisputed that Olmetti suffered significant injuries to his head and torso, which were so serious

that KCCF personnel transported him to a hospital emergency room.  Under these circumstances,

King and Linsea's actions of "pulling" and "jerking" Olmetti was not a *de minimis* use of force.

The hospital records reflect that Olmetti arrived at the hospital emergency department on April 3,

2018, at 9:11 a.m. for an emergency admission.  *See* Hospital Records (April 3, 2018) (ECF No.

97-6, PageID.2403).  Olmetti's chief complaint was a fall, with his diagnosis being "Laceration of

scalp, initial encounter" and "Closed fracture of multiple ribs of left side, initial encounter."  *Id*.

Hospital records reflect the following treatment:

This is a 60-year-old male with the past medical history of alcohol abuse
who is currently incarcerated who presented with a fall from a top bunk bed.  On
evaluation, his vital signs were stable.  His neurological exam is within normal
limits.  He had a laceration to the back of his head and had extreme pain over the
side of his left chest and in his left arm.  There are no obvious deformities of the
left arm. He had been found just a few minutes after the fall, making of a significant

crush injury of the left arm with rhabdomyolysis unlikely.  We obtained a CT of the head and chest x-ray.  He was given a total of 8 mg of morphine and 4 mg of Zofran and 2.5 mg of Haldol and 25 mg of Benadryl for his pain and nausea.  We also obtained an INR, as the patient has a history of alcohol abuse and I do not know whether not he has cirrhosis.  We also obtained plain films of the entire left upper extremity, as he was diffusely tender on examination.  This revealed no abnormality other than a likely chronic appearing small chip within the left elbow joint. The chest x-ray revealed fractures of the 2nd and 5th left lateral ribs. The head CT was within normal limits.  We repaired the laceration on his scalp with staples[.]

*Id*. at PageID.2404.  Olmetti's final diagnoses were "Laceration of scalp" and "Closed fracture of multiple ribs of left side."  *Id*.

In the Court's experience, a person visits a hospital emergency room because he or she has a medical emergency.  The medical records here indicate that Olmetti had a medical emergency which required, among other treatment, a neurological examination, a CT scan of the head, a chest x-ray, repair of a lacerated scalp, and the administration of drugs including morphine. Viewing the factual evidence and all reasonable inferences in favor of the nonmoving party, a genuine issue of material fact exists as to whether defendants King and Linsea used excessive force in pulling or jerking Olmetti to the hospital emergency department.  In reaching this determination, the Supreme Court has observed that,

Injury and force, however, are only imperfectly correlated, and it is the latter that ultimately counts. An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury.

*Wilkins*, 559 U.S. at 38.[4]

The issue for the Court is whether Olmetti has shown that the force purposely or knowingly used against him was objectively unreasonable.  *See Coley*, 799 F.3d at 538.  Here, Deputies King and Linsea were transporting a pre-trial detainee – with injuries to his head and probable injuries to his torso and left arm – to the emergency room.  Viewing the evidence in the

---

[4] To make it clear, there is no evidence that defendants "gratuitously beat" Olmetti.

light most favorable to the non-movant, the Court concludes that it would be objectively unreasonable for two officers to pull or jerk such a detainee across the parking lot to the emergency room.    A genuine issue of material fact exists as to whether Deputies King and Linsea used excessive force.  Accordingly, Deputies King and Linsea's motion for summary judgment should be denied with respect to Olmetti's claim in Count II that they used excessive force when transporting him to and from the hospital.

### 5.    Fourteenth Amendment claims against Kent County (Count V)

Olmetti alleged that, "Defendants practiced and/or permitted customs and/or policies and/or practices that the individual Defendants acted in conformity with and which were the moving force behind the violations of Plaintiff's constitutional rights."  Compl. at PageID.11. These customs, practices, and/or policies included: failing to train staff to ensure that they do not act deliberately indifferent to the needs of inmates; failing to supervise staff so as to prevent the violations of inmates' constitutional rights; failing to recognize obvious medical conditions; failing to train staff regarding the proper use of force; and failing "to enact and/or follow medical protocol and/or policies and/or procedures in dealing with inmates with obvious and serious medical conditions."  *Id*. at PageID.11-12.

A plaintiff who sues a municipality for constitutional violations under 42 U.S.C. § 1983 must establish that a governmental policy or custom caused the alleged injury. *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 904 (6th Cir. 1998), citing *Monell v. Department of Social Services*, 436 U.S. 658, 690-91 (1978). "In other words, a municipality can be liable under § 1983 only where its policies are 'the moving force' behind the constitutional violation." *Sova*, 142 F.3d 898 at 904, citing *Monell*, 436 U.S. at 694.  A municipal policy includes "a policy statement, ordinance, regulation, or decision officially adopted and promulgated." *Powers v. Hamilton County Public*

23

*Defender Commission*, 501 F.3d 592, 607 (6th Cir. 2007) (quoting *Monell*, 436 U.S. at 690).  In contrast, an actionable custom "has not received formal approval through . . . official decisionmaking channels." *Powers*, 501 F.3d at 607 (quoting *Monell*, 436 U.S. at 690-91). "A § 1983 plaintiff may establish the existence of a custom by showing that policymaking officials knew about and acquiesced in the practice at issue." *Powers*, 501 F. 3d at 607.

As discussed, Olmetti has failed to establish that Deputies Santiago, Cole or Mezsets violated his Fourteenth Amendment rights.  Because Olmetti failed to establish that these Kent County employees violated a constitutional right, Kent County cannot be liable for a non-existent violation of a constitutional right.  *See Mattox v. City of Forest Park*, 183 F.3d 515, 523 (6th Cir. 1999) ("If the plaintiffs have failed to state a claim for violation of a constitutional right at all, then the [municipality] cannot be liable for violating any right any more than the individual defendants can.").  Accordingly, Kent County should be granted summary judgment as to all of Olmetti's claims which arise from the actions of Deputies Santiago, Cole and Mezsets.

However, this argument does not apply to Olmetti's excessive force claim against Deputies King and Linsea.  As discussed, the Court concluded that a genuine issue of material fact exists as to whether King and Linsea used excessive force in transporting Olmetti to the hospital. The issue before the Court is whether Olmetti has presented evidence that Kent County had an unlawful policy or custom which was "the moving force" behind this constitutional violation.

> One way to prove an unlawful policy or custom is to show a policy of inadequate training or supervision.  *See City of Canton v. Harris*, 489 U.S. 378, 387, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).  To succeed on a failure to train or supervise claim, the plaintiff must prove the following: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury.  *See Russo v. City of Cincinnati*, 953 F.2d 1036, 1046 (6th Cir. 1992).

24

*Ellis ex rel. Pendergrass v. Cleveland Municipal School District*, 455 F.3d 690, 700 (6th Cir.

2006).

> This court has identified two situations justifying a conclusion of deliberate indifference in claims of failure to train or supervise. "One is failure to provide adequate training in light of foreseeable consequences that could result from a lack of instruction." *Brown v. Shaner*, 172 F.3d 927, 931 (6th Cir. 1999).  In *City of Canton*, for example, the Supreme Court indicated that a city could be deliberately indifferent by failing to train its police officers in the use of deadly force because it is obvious that the officers will need to use such force when they are armed with guns and required to arrest fleeing felons.  489 U.S. at 390 n. 10, 109 S. Ct. 1197.  In this case, [the plaintiff] does not argue that it was inherently foreseeable that teachers would assault students if not trained or supervised properly. Instead, [the plaintiff] argues a different type of deliberate indifference.  "A second type of . . . deliberate indifference is where the city fails to act in response to repeated complaints of constitutional violations by its officers." *Brown*, 172 F.3d at 931.

*Ellis*, 455 F.3d at 700-01.  Olmetti does not address which method he relies upon here.

It appears that Olmetti relies on the situation set out in *Brown*.

> In a "narrow range of circumstances," a plaintiff can show that a municipality was deliberately indifferent by "fail[ing] to equip law enforcement officers with specific tools to handle recurring situations." *Brown*, 520 U.S. at 409, 117 S.Ct. 1382. As the Supreme Court explained in *City of Canton*, "it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." 489 U.S. at 390, 109 S.Ct. 1197.

*Ouza v. City of Dearborn Heights, Michigan*, 969 F.3d 265, 287 (6th Cir. 2020).  To support his

claim, Olmetti cites portions of King's and Linsea's testimony regarding the frequency of training,

*e.g.*: "Defendant King testified that after the academy and FTO training (lasts 8-12 weeks), he has

not had training on deliberate indifference or conditions of confinement. (Exhibit FF, pp. 13-14)

[ECF No. 96-6, PageID.2281]"; and "Defendant Linsea could not testify whether his use of force

training was consistent or sporadic. (Exhibit EE, p. 11) [ECF No. 96-5, PageID.2256]."  Olmetti's

Response (ECF No. 89-1, PageID.1828-1829).

As discussed, Deputies King and Linsea were tasked with escorting an injured pre-trial detainee to the hospital emergency department. To paraphrase the Supreme Court's opinions in *Brown* and *City of Canton*, did Kent County fail to equip the KCCF deputies with the specific tools needed to handle a recurring situation, *i.e.*, the transportation of KCCF inmates to a hospital emergency room, where the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of Kent County can reasonably be said to have been deliberately indifferent to the need. In the Court's opinion, it is obvious that deputies escorting or transporting an injured inmate to an off-site emergency room need different tools than deputies escorting or transporting a healthy inmate within the controlled confines of the jail. However, Olmetti has failed to present any evidence as to whether the escort or transport of an injured inmate to an off-site hospital emergency room is a recurring situation at KCCF which would justify additional training. *See Brown*, 520 U.S. at 409; *Ouza*, 969 F.3d at 287. Accordingly, Olmetti's claim against Kent County related to Deputies King and Linsea fails. For all of these reasons, the County's motion for summary judgment should be granted as to Count V.

### 6. Qualified immunity

The deputy defendants also seek summary judgment on the basis of qualified immunity. Under the affirmative defense of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right. . . Put simply, qualified immunity protects

all but the plainly incompetent or those who knowingly violate the law." *Mullenix v. Luna*, 577 U.S. 7, 11-12 (2015) (internal quotation marks omitted).  The doctrine of qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Carroll v. Carman*, 574 U.S. 13, 17 (2014).

The existence of qualified-immunity inquiry involves two questions: whether the defendant violated a constitutional right and whether that right was clearly established.  *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009).  "These questions may be answered in any order; if either one is answered in the negative, then qualified immunity protects the official from civil damages." *Brown v. Chapman*, 814 F.3d 447, 457 (6th Cir. 2016).  "On summary judgment, the court must analyze these questions after construing the facts in the light most favorable to the party asserting the injury and drawing all reasonable inferences in that party's favor." *Id*.  When a defendant raises a defense of qualified immunity, the plaintiff bears the burden of demonstrating that the defendant is not entitled to qualified immunity." *Livermore ex rel Rohm v. Lubelan*, 476 F.3d 397, 403 (6th Cir. 2007).

As discussed, Olmetti has failed to establish that Deputies Mezsets, Santiago, or Cole violated a federal constitutional right.  In the absence of a constitutional violation, these three defendants are entitled to qualified immunity.  *See Pearson*, 555 U.S. 232; *Brown*, 814 F.3d at 457.  However, with respect to Deputies King and Linsea, qualified immunity cannot be granted because a genuine issue of material facts exists. *See, e.g., Lyttle v. Riley*, 524 Fed. Appx. 226, 228 (6th Cir. 2013) ("We cannot grant qualified immunity to [the defendant] because disputed issues of material fact preclude a determination of whether a constitutional violation occurred.").  Accordingly, defendants' motion for summary judgment on the ground of qualified immunity

should be granted as to Deputies Santiago, Cole and Mezsets, and denied as to Deputies King and Linsea.

### 7.    Negligence (Count IV)

In this claim, Olmetti alleged gross negligence as to all defendants, stating in part that: that "[d]efendants owed a duty to [p]laintiff not to engage in activities or actions that would endanger or cause harm to individuals"; that "[d]efendants breached their duties by acting indifferently and/or grossly negligent without regard to [p]laintiff's health and welfare"; and that "according to MCL 691.1407, the breach of [d]efendants' duties to exercise reasonable care was reckless and amounts to gross negligence." Compl. at PageID.10.

In addressing the undersigned's previous report, which recommended dismissal of Count IV (gross negligence) as it pertained to defendant N.P. Sherwood's treatment of Olmetti, the Court found that:

> There is no such thing as a claim for gross negligence, but negligence alone is a real cause of action. Olmetti has sufficiently pled such a claim in Count IV; it should not be dismissed.

Order (ECF No. 23, PageID.355). The Court continued,

> Under Michigan law, the Court must examine the substance of Olmetti's allegations to determine whether they sound in malpractice rather than negligence. *Jones v. Corr. Med. Servs., Inc.*, 845 F. Supp.[2d] 824, 845 (W.D. Mich. 2012) (citing *Dorris v. Detroit Osteopathic Hosp. Corp.*, 594 N.W. 2d 455, 464 (Mich. 1999)). "[A] claim that defendant did nothing in response to a known risk is a matter of negligence, not malpractice." *Id*. at 846 (citing *Bryant v. Oakpointe Villa Nursing Ctr.*, 684 N.W. 2d 864, 875 (Mich. 2004)). The heart of Olmetti's claim against Sherwood is that he told her of his need for a lower bunk because of his health problems and she failed to provide one. Taking his allegations as true, Sherwood did nothing in response to the known risk of Olmetti's conditions.

*Id*.

As an initial matter, it is unclear as to whether the negligence claim alleged in Count IV goes beyond a claim that N.P. Sherwood engaged in negligence (as opposed to a claim that

28

N.P. Sherwood engaged in medical malpractice).  Assuming that the negligence claim is intended to apply to all defendants, Olmetti's claim fails as to the conduct alleged against Deputies King and Linsea, *i.e.*, that King and Linsea dragged and pushed Olmetti going to and from the hospital. The conduct alleged against King and Linsea (characterized in the federal claim as the use of excessive force) was in the nature of intentional conduct or an intentional tort, not negligence. Olmetti cannot attempt to transform this claim, which in terms of state law would be an intentional tort, into a claim of gross negligence.  *See Rucinski v. County of Oakland*, 655 Fed. Appx. 338, 344 (6th Cir. 2016) ("Michigan courts have repeatedly rejected plaintiffs' attempts to transform claims involving elements of intentional torts into claims of gross negligence.").

Next, because Olmetti did not identify any wrongful conduct against Deputy Mezsets, defendant Mezsets should be granted summary judgment on this claim.

However, the Court reaches a different result with respect to Deputies Santiago and Cole.  Olmetti claims that Santiago did not classify him for a low bunk detail despite his clear need for it and that Cole moved Olmetti to a cell without a low bunk detail despite Olmetti's protests. Based on the record, it is unclear whether these actions involved an intentional tort.  *See, e.g.*, *Murphy v. Bonn*, No. 1:13-cv-220, 2014 WL 4187806 at *1 (W.D. Mich. Feb. 19, 2014), *R&R adopted as modified*, 2014 WL 4187718 (W.D. Mich. Aug. 22, 2014) ("Conduct that is deliberately indifferent is not necessarily intentional.").  Accordingly, with respect to Count IV, defendants' motion for summary judgment should be granted as to Deputies Mezsets, King and Linsea, and denied as to Deputies Santiago and Cole.

### III.    Dismissal of state law claim

In the alternative, if the Court grants summary judgment as to all of the federal constitutional claims alleged against a particular defendant, then the undersigned recommends

dismissing the remaining state law negligence claim alleged against that defendant.  Here, the Court exercised its supplemental jurisdiction over Olmetti's state law claim pursuant to 28 U.S.C. § 1367, presumably because that claim was intimately related to the alleged Fourteenth Amendment violations.  *See* 28 U.S.C. § 1367(a) ("the district court shall have supplemental jurisdiction over all other claims that are so related to the claims in the action within such original jurisdiction that they form a part of the same case or controversy").  Under 28 U.S.C. § 1367(c)(3), a district court may decline to exercise supplemental jurisdiction over a claim if the court "has dismissed all claims over which it has original jurisdiction."  Once a court has dismissed a plaintiff's federal claim, the court must determine whether to exercise, or not to exercise, its supplemental jurisdiction under § 1367. *See Campanella v. Commerce Exchange Bank*, 137 F.3d 885, 892-893 (6th Cir. 1998).

In determining whether to retain supplemental jurisdiction over Olmetti's state law claims, "[a] district court should consider the interests of judicial economy and the avoidance of multiplicity of litigation and balance those interests against needlessly deciding state law issues." *Landefeld v. Marion General Hospital, Inc.*, 994 F.2d 1178, 1182 (6th Cir. 1993).  Ordinarily, where a district court has exercised jurisdiction over a state law claim solely by virtue of supplemental jurisdiction and the federal claims are dismissed prior to trial, the court will dismiss the remaining state law claims. *See Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 521 (6th Cir. 2007) ("Generally, once a federal court has dismissed a plaintiff's federal law claim, it should not reach state law claims.").  "Residual jurisdiction should be exercised only in cases where the interests of judicial economy and the avoidance of multiplicity of litigation outweigh our concern over needlessly deciding state law issues." *Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006) (internal quotations omitted). Dismissal, however, remains "purely discretionary."

30

*Carlsbad Technology, Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) (citing 28 U.S.C. § 1367(c).

Here, assuming that the Court grants summary judgment on the federal claims alleged against Deputies Santiago and Cole, the undesigned finds no reason for this Court to decide a state law claim of negligence against these two defendants. This additional state claim will extend the trial, involve more lengthy jury instructions, and invite potential jury confusion with respect to the elements of the federal and state claims, *e.g.*, applying the different versions of immunity applicable under state and federal law.  Accordingly, if the Court grants Deputies Santiago and Cole summary judgment on all of the federal claims alleged against them then the Court should dismiss Olmetti's state law negligence claim alleged against them.

### IV.    Recommendation

For the reasons set forth above,

I respectfully recommend that defendants' motion for summary judgment (ECF No. 68) be **GRANTED** as to Counts I (deliberate indifference), II (inhumane conditions), and V (municipal liability), and that defendants Kent County and Justin Mezsets be dismissed from this case.

I further recommend that defendants' motion for summary judgment be **DENIED** as to Count III (excessive force) directed at defendants Tyler King and Justin Linsea.

I further recommend that defendants' motion for summary judgment be **GRANTED** as to Count IV (negligence) directed against defendants Tyler King and Justin Linsea, and **DENIED** as to defendants Eric Santiago and Shane Cole.

Finally, in the alternative, if the Court grants Eric Santiago and Shane Cole summary judgment on all of the federal claims alleged against them, then I further recommend

that the negligence claims alleged against Santiago and Cole be **DISMISSED** pursuant to 28 U.S.C. § 1367.

Dated: July 28, 2022                              /s/ Ray Kent
                                                  RAY KENT
                                                  United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report.  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).